Filed 5/12/14  In re S.B. CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re S.B. et al., Persons Coming Under the Juvenile Court Law. | |
| J.W., <br><br> Petitioner, <br><br> v. <br><br> THE SUPERIOR COURT OF CONTRA COSTA COUNTY, <br><br> Respondent; <br><br> CONTRA COSTA COUNTY CHILDREN AND FAMILY SERVICES BUREAU, <br><br> Real Party in Interest. | A141152 <br><br> (Contra Costa County <br> Super. Ct. Nos. J12-01584, J12-01585) |

**I.**

**INTRODUCTION**

At the 12-month review hearing in this dependency proceeding, the juvenile court terminated reunification services to petitioner J.W. (Mother), and set a hearing under Welfare and Institutions Code section 366.26.  Mother filed a timely writ petition under California Rules of Court, rule 8.452.[1]

---

[1] All further references to statutes are to the Welfare and Institutions Code unless otherwise noted.  All further references to rules are to the California Rules of Court.

1

Mother argues that because the court found her two school-age children (Minors) not to be adoptable and no guardian was available, the court should have ordered an alternative planned permanent living arrangement rather than setting a section 366.26 hearing. Mother also contends that because she was in jail for about a month during the proceedings, the court should have provided her with an additional six months of reunification services. We reject these contentions, and deny Mother's writ petition.

## II.

### FACTS AND PROCEDURAL BACKGROUND

Minors are a girl born in 2001 and a boy born in 2005. Minors have the same alleged father (Father). Father was abusive to Mother, and was convicted of domestic violence four times between March 2001 and October 2007. Mother separated from Father sometime after the boy was born, and as of November 2012, Minors had not seen Father in over a year.[2] Mother was awarded sole legal and physical custody of Minors in January 2012.

Mother has had a history of mental illness, including depression and paranoia, since her late teens. She is supported by public assistance, including disability and food stamps. Due to Father's substance abuse, his domestic violence, and Mother's mental illness, the family came to the attention of social services agencies in three Bay Area counties on several occasions between 2006 and 2011. However, none of the referrals prior to October 2011 resulted in the initiation of dependency proceedings.

In October 2011, Mother was hospitalized in San Francisco due to delusions and paranoia. No relative could be located who was willing to take custody of Minors, so they were detained by San Francisco child welfare authorities, and a dependency petition

---

[2] Father is apparently homeless. He could not be located, and did not participate in the proceedings in the court below. As of January 2013, Minors had no interest in seeing him, and only the girl was willing even to speak with him on the telephone. Father has not appeared in this writ proceeding.

2

was filed.  Mother regained custody of Minors in November 2011, however, and the case was transferred to Contra Costa County, where the family was living, with a plan of family maintenance.

The San Francisco dependency proceedings were terminated in January 2012.  The record is silent as to how Mother and Minors fared between January and October 2012.  It does indicate that for a period of time in October 2012, Mother and Minors stayed in a motel in Contra Costa County paid for by Mother's church.  This arrangement ended on October 27, 2012, for reasons not explained in the record.

In the evening of October 27, 2012, Mother sent a text message to V.B., a woman in Antioch who had provided daycare for Minors in the past, asking for a place to stay.  V.B. agreed, but soon became concerned due to Mother's strange behavior, and her apparent intention to move into V.B.'s house without V.B.'s permission.  On November 1, 2012, following an argument with V.B., Mother was taken to the hospital complaining of back pain.  V.B. did not want Mother to return to V.B.'s home, and did not want to care for Minors, so respondent Contra Costa County Children and Family Services Bureau (the Bureau) was contacted to take emergency custody of Minors.  Minors were detained, and the Bureau filed dependency petitions (one for each Minor) alleging that Mother was unable to care for Minors due to her mental health issues.

Minors were placed with their maternal great aunt, J.R., on an emergency basis.  On November 2, 2012, a Bureau social worker met with Mother.  Mother told the social worker she did not object to Minors staying with J.R. until Mother was able to find housing, which she was in the process of doing.  Mother also acknowledged that she had a history of mental health problems and had not been to her treatment provider for two weeks.  The social worker subsequently obtained Minors' school records, which showed the girl was absent eight times during September and October, and the boy was late four times, and had six additional absences.

3

On November 9, 2012, the social worker met with Mother again and discussed mother's finances and her plans to obtain housing. Mother told the social worker that she was diligent about getting Minors to school on time, and had asked Minors' schools to give her their homework assignments. Mother also told the social worker she was studying criminal justice at a technical college, and had applied for a job as a study hall monitor.

On the same date, the Bureau received a summary of Mother's records from her mental health treatment provider. The provider confirmed that Mother had not attended her therapy appointments since late September 2012. Mother's diagnosis was described as "major depressive disorder, recurrent, severe with paranoid mood congruent features," as well as nonrecurring bulimia and some chronic physical conditions. Mother was reported to be "working on balance and making appropriate choices" and "continuing to learn her role as mother and behave accordingly," including "learning to look to adults for social support . . . instead of her children." The report noted that in the past, Mother's failure to attend her therapy sessions regularly had "led to increased symptoms which have become overwhelming at times." (Original italics omitted.)

On November 13, 2012, Mother and J.R. attended a team meeting with representatives of the Bureau and a social services provider, and Mother agreed that the best arrangement for Minors would be placement with a relative. At the jurisdictional hearing on December 10, 2012, the petitions were amended to allege that Minors were "at risk due to . . . [M]other's depression which interferes with her ability to provide stable, consistent housing and care" for Minors. Mother pleaded no contest to the amended petitions, and the court declared Minors dependents under section 300, subdivision (b).

The Bureau's report for the disposition hearing (Disposition Report) was filed on January 16, 2013. It indicated that Mother had seen the children daily in the early part of November, and that since mid-November, Mother had visited with Minors three times, in a supervised setting. The visits had generally gone well, with the exception of an

4

incident when Mother appeared to go into a trance state. In early January, the girl told the social worker that before Minors were detained, Mother stopped taking her medication and stayed in bed all the time. The girl said she took care of Mother, helped her cook and clean, and tried to get her to take her medication.

As of the date of the Disposition Report, Minors were still living with J.R. in San Francisco. Unfortunately, J.R.'s home turned out not to have sufficient space to be approved as a long-term placement for Minors. The Bureau was in the process of determining whether an exception could be made. Minors' maternal grandmother (Grandmother) had assisted the family in the past, and was helping J.R. (her sister) take care of Minors, but did not want them placed with her. Mother now preferred not to have Minors placed with relatives, as she felt her relatives were trying to take Minors away from her, and also believed they were being abused and neglected in J.R.'s home.

The Disposition Report recommended that Minors remain placed out of Mother's custody, and that Mother receive reunification services, including mental health treatment, as well as supervised visitation for at least an hour twice a month. The Bureau opined that Mother's mental health problems, and her difficulty managing her finances so as to provide Minors with housing and food, made it unsafe to return Minors to her until her mental health stabilized.

At the disposition hearing on March 13, 2013, the juvenile court removed Minors from Mother's custody and ordered reunification services, including mental health treatment. The court also ordered Mother to stay away from the schools Minors were attending in San Francisco, and not to have any unmonitored visits or telephone contact with them. Despite this order, on May 2, 2013, Mother picked the boy up from his school, and then went with him to the girl's school to try to retrieve her, but did not succeed. The boy was later found safe at Mother's apartment in Contra Costa County, and Mother was arrested on felony kidnapping and child endangerment charges. Mother was later found guilty of a misdemeanor charge arising from this incident, placed on five

years probation, and ordered to complete treatment programs for substance abuse, mental health, and parent education.

On June 11, 2013, the Bureau filed a supplemental petition seeking to move Minors to foster care. J.R. was no longer willing to provide a home for them due to the disturbances caused by Mother's behavior, and no other relative was willing and able to take them in. The Bureau reported that at J.R.'s request, Minors had been removed from J.R's home on June 7, 2013, and moved to a foster home. On June 12, 2013, the juvenile court ordered that Minors be placed in an approved foster home, and that reunification services continue to be provided, including mental health services and parenting education for Mother. The court again ordered Mother to stay away from Minors' schools, and also ordered that she stay away from Minors' foster home. The court directed the foster caregiver to monitor Mother's telephone calls with Minors.

As of August 14, 2013, the Bureau social worker reported that Minors were healthy and well cared for, had attended summer camp, and were looking forward to starting school. Mother was scheduled to have a visit with them that day, but she did not appear, although she was seen later at a bus stop near the location where the visit was to have taken place.

In a status review report prepared for the 6-month review hearing on September 26, 2013, the Bureau reported that Minors remained in their foster home and were developmentally on target, although the boy needed and was receiving special education services. Minors were receiving mental health services. The girl had been diagnosed with adjustment disorder with depressed mood, and was described as "very parentified." The boy had adjustment disorder with anxiety, and acted out physically when angry, resulting in an overnight hospitalization in September for mental health reasons. Minors had been placed in Santa Clara County in order to keep them together, which the Bureau described as a goal "of high priority."

Minors had been in telephone contact with Grandmother about twice a week. On September 19, 2013, Mother went to Grandmother's workplace and physically attacked her. Grandmother later obtained a restraining order against Mother. Grandmother told a Bureau social worker that she hoped to be able to provide care for Minors in the future, but would not be able to do so unless she found care for Mother's sister, who was living with her and also had mental health issues.

Mother remained homeless and continued to have serious mental health and anger issues, and the Bureau did not believe Minors' safety could be assured in her care. Mother expressed love for Minors, and wanted to visit with them, but it had been difficult for the Bureau to arrange that for various reasons. Mother had been unwilling to provide the Bureau with the releases needed to permit the Bureau to monitor her compliance with her case plan.[3] The Bureau recommended that Mother continue to receive reunification services, but noted that Mother needed to "commit to fully engaging in her reunification services," and release the information the Bureau needed to monitor her progress. The Bureau still considered reunifying Minors with Mother to be its primary plan, but intended to seek a permanent home with a relative if that proved not to be possible.

At the hearing on September 26, 2013, the court ordered that Mother have a minimum of two hours once a week of supervised visitation. In a supplemental report filed on October 8, 2013, the Bureau detailed the difficulties the assigned social worker was experiencing in arranging Mother's visitation. According to the report, Mother was homeless and had no mailing address. She had changed her telephone number several times, had not set up her voicemail account, and did not know how to answer her phone. She also had difficulty reaching the locations of the visits on public transportation, even though she was provided with tickets. As a result, she had missed three out of four

---

[3] Mother reportedly signed all the releases requested by the Bureau sometime before late November 2013.

7

scheduled visits during the period between July 22 and October 7, 2013. Another visit was scheduled for October 12, 2013, and the Bureau had arranged for mother to be accompanied to the visit by a volunteer visitation supervisor. In addition, Mother reported she was receiving mental health treatment, but still refused to provide the Bureau with the information and releases necessary for the Bureau to assess her progress.

On October 8, 2013, the juvenile court held a combined disposition hearing on the supplemental petition and review hearing on the original petition. The court made no changes in Minors' placement, but reduced Mother's minimum visitation to one hour once per week, under supervision. The court also reiterated its order that Mother stay away from Minors' schools, and that the foster caretaker monitor Minors' telephone calls. The court set the matter for a further review hearing on December 9, 2013.

On October 30, 2013, Mother told the Bureau social worker that she was living in a local shelter and had submitted applications for housing. By early December, however, the Bureau had no further information regarding Mother's housing situation, and believed she was still homeless.

Mother had uneventful two-hour visits with Minors on October 12, October 19, and November 2. The next visit took place at a fast food restaurant on November 9, 2013. During the visit, the girl mentioned that Minors planned to visit with Grandmother on the following day, which caused Mother to become agitated and disruptive. The girl was upset by Mother's behavior and began to cry, and the social worker had to end the visit early. Mother failed to confirm the next scheduled visit on November 16, so it was cancelled, and on November 22, she told the social worker that she was not willing to travel to Santa Clara County for further visits, so none were scheduled. However, Mother did continue to speak with Minors on the telephone twice a week, under the supervision of the foster parent, who reported no concerns about the conversations.

At the 12-month review hearing on December 9, 2013, Mother requested that the matter be set for a contested hearing, and the court continued the matter to January 8,

2014.  On January 8, 2014, Mother failed to appear for the hearing, and could not be located.  In addition, the assigned social worker was unavailable due to a medical leave.  For both of these reasons, the court continued the matter to January 29, 2014, leaving its existing orders in place, except that it transferred authority regarding Minors' educational needs to the foster caregiver, over the objection of Mother's counsel.

In a memorandum to the juvenile court filed on January 29, 2014, the Bureau reported that on January 24, 2014, a Bureau social worker learned from Mother's probation officer that Mother had been arrested and taken to jail on January 7, 2014, where she remained incarcerated.  The arrest stemmed from Mother's behavior during a visit with Mother's grandmother at a care facility.  Mother reportedly became angry, pulled a telephone out of a wall, and cut up a couch.  Mother did not contact the Bureau or Minors after she was arrested.  Minors had last seen Mother on January 4, 2013.  They were described as having been traumatized because they had had no contact with Mother since that visit, and did not know why.  This resulted in a deterioration of Minors' behavior.

Based in part on this incident, the Bureau opined that Mother had been inconsistent in considering Minors' emotional needs and had not progressed on her reunification case plan.  Accordingly, the Bureau recommended that reunification services be terminated, as Mother was not able to meet Minors' needs and provide them with a safe and healthy environment.  Neither the Bureau nor Mother's counsel had known of Mother's incarceration in time to arrange a removal order so she could appear at the hearing on January 29, 2014.  Accordingly, the matter was continued to February 19, 2014.  Mother was released from custody on February 11, 2014.

At the hearing on February 19, 2014, the most recent full status review report before the judge was the report prepared in late November 2013 for the 12-month review

9

hearing (the 12-month report).[4] The court also had before it the Bureau's update memorandum regarding Mother's arrest that was filed with the court on January 29, 2014.

In the 12-month report, the Bureau indicated that Mother had not been successful in completing her case plan. She had enrolled in a parenting class and attended several sessions, but had then been asked to leave due to a conflict with another person in the class, and she had not enrolled in another program. She was meeting regularly with a case manager at a social services agency, but he reported that her progress was "up and down." Mother was also not in compliance with the conditions of her criminal probation, which caused the Bureau to be concerned that she might face additional custody time in the future. Mother had met four times with a psychiatrist, who had increased Mother's medication after she arrived at a hospital emergency room in late September complaining that she was hearing voices. The psychiatrist stated that Mother's diagnosis was uncertain, but she was either bipolar or schizophrenic, with symptoms of paranoia and occasional auditory hallucinations, as well as "a personality structure that contributes to difficult relationships."

According to the 12-month report, Mother's goal was to find housing in San Francisco, have the dependency proceedings transferred there, and regain custody of Minors. The Bureau did not believe Minors would be safe in Mother's care, however, due to her continuing serious challenges with mental health and anger issues. In this regard, the Bureau was concerned about Mother's failure to participate in individual therapy and parenting education, and her inconsistency about visiting with Minors, which had "a significant impact on their well being."

---

[4] The 12-month report was prepared in anticipation of the original 12-month review hearing date of December 9, 2013, but was not formally filed with the court until February 19, 2014.

10

The 12-month report acknowledged that Mother loved Minors "immensely" and wanted to reunify with them, but noted that her visits with them had not always been consistent, and that she remained homeless and did not have prospects for stable housing. Mother had not participated in therapy or parenting education, nor had she addressed her anger management issues. The Bureau acknowledged that Mother had made efforts to reunify with Minors, but concluded that she had not demonstrated sufficient progress to warrant additional reunification services.

Minors' overall health was good, and their doctor expressed no medical concerns about them. The girl had adjusted well to her foster placement and was doing well in school socially, but was having difficulty with her academic work and was not performing at grade level. Her school had referred her for an assessment as to whether she needed Individualized Education Plan (IEP) services. She was in weekly therapy, which she said she enjoyed, and did not exhibit any behavior that would warrant medication. She had enjoyed a visit with Grandmother and J.R. in November very much, and wanted to see them, as well as Mother, more often. She was distressed at the conflict between Mother and her other relatives, as she felt loyalty to both.

The boy was already on an IEP for learning disability. While normally shy, sweet, and helpful to others, he had some difficulty with aggressive behavior, and on one occasion had been unable to deescalate during an altercation with another foster child who had been placed in the same home, but since removed. He was also in therapy, and his therapist believed he would benefit from a more intensive therapeutic program. Shortly before the preparation of the 12-month review report, the boy was enrolled in a program that provided therapy twice a week as well as other services. The boy expressed indifference to the prospect of visiting with Grandmother, but appeared to feel torn between her and Mother. He had lied to Mother about seeing Grandmother in November, because he did not want to anger Mother.

11

The 12-month report opined that keeping Minors together was "of highest priority," despite the girl's tendency to bully the boy and trigger his aggressive behavior. Minors' current foster home was not a permanent placement for them, and the Bureau was investigating possible relative placements or other possible guardianship arrangements. The Bureau had not identified any relatives who could care for the children, however, and Mother had expressed a preference for foster care over placement with her relatives. The 12-month report recommended that Mother's reunification services be terminated, and that the court set a section 366.26 hearing.

At the hearing on February 19, 2014, the Bureau's assigned social worker, Juliette Scott, testified that Mother's probation officer had told her Mother was enrolled in a parenting class which was to start that day. Other than that, Scott had no updated information regarding Mother's compliance with her case plan. Scott had seen Minors the previous day. She reported that Minors enjoyed visiting with Mother, looked forward to her phone calls, and had been traumatized while Mother was incarcerated and they did not know where she was. Since Mother's release from custody, her supervised telephone calls with Minors had resumed. Scott did not know whether Mother had seen her psychiatrist recently, but she had talked to Mother's caseworker at the social services agency, who said Mother had not been in touch with him.

Mother was present at the hearing, but did not testify. Her counsel requested that she be provided with additional services, especially for her mental health issues, and additional time to continue to try to reunify with Minors. Counsel for the Bureau pointed out that although the hearing was technically a 12-month review, in fact the case had been pending for 15 months, and opined that providing Mother with three more months of services would be unlikely to change anything.

At the conclusion of the hearing, the court found by clear and convincing evidence that the Bureau had provided reasonable reunification services to Mother, but Mother had "been either unwilling or unable to work in any sort of collaborative fashion" with the

12

Bureau, and had "continued to engage in very aggressive conduct that calls into question her mental health and her stability." The court acknowledged that Mother and Minors clearly loved each other very much, but said it was not possible, based on the evidence, for the court to find a reasonable probability that Minors could be returned to Mother within the applicable 18-month period.

Noting that Minors were not likely to be adopted and probably did not want to be, the court questioned whether the next step should be a section 366.26 hearing or the designation of a planned permanent living arrangement (PPLA), given the apparent unavailability of a guardianship arrangement. The Bureau's counsel responded that "it is a possibility that one of the children would be able to have a guardian in place," and asked the court to set a section 366.26 hearing. The court granted the request, explaining to Mother that at the hearing, the court could terminate her parental rights and place Minors for adoption, but also could instead place the children in legal guardianship or long-term foster care.

The court then set the section 366.26 hearing for June 16, 2014, and advised Mother of her right to seek writ review. Mother timely filed a notice of intent to file a writ petition, and timely filed the petition with this court.

## III.

### DISCUSSION

### A. Termination of Reunification Services

At a 12-month review hearing, if the court finds that it would be detrimental to return a dependent child to the custody of the child's parent,[5] the statutory scheme

---

[5] Mother's writ petition does not challenge the juvenile court's finding that as of the date of the 12-month review hearing, the immediate return of Minors to her custody would have been detrimental.

governing juvenile dependency cases gives the juvenile court a limited range of options.[6] As one option, the court may grant an additional six months of reunification services. This option is only available, however, if the court finds either (1) that there is a substantial probability that the child will be returned to the parent within the extended period, or (2) that reasonable reunification services have not been provided.[7] (§ 366.21, subd. (g)(1); see rule 5.715(b)(4)(A).)

In order to find a substantial probability that the child will be returned to the parent's custody within the extended period, the court must make all of the following findings: "(A) That the parent . . . has consistently and regularly contacted and visited with the child. [¶] (B) That the parent . . . has made significant progress in resolving problems that led to the child's removal from the home. [¶] (C) [That] [t]he parent . . . has demonstrated the capacity and ability both to complete the objectives of his or her treatment plan and to provide for the child's safety, protection, physical and emotional well-being, and special needs." (§ 366.21, subd. (g)(1); see rule 5.715(b)(4)(B), (C).)

In the present case, the juvenile court declined to extend Mother's reunification services for another six months based on an express finding that it was not reasonably probable Minors could be returned to Mother within that time. Our role, as the reviewing court, is limited to determining whether that finding is supported by substantial evidence. Under this standard of review, we construe the record in the light most favorable to the court's determinations, and draw all reasonable inferences from the evidence to support the findings and orders. We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the

---

[6] For simplicity, we outline only the statutory provisions that apply where all the children involved are over the age of three, and only one parent is involved in the dependency proceedings.

[7] In the present case, although Mother argues she should have received an additional six months of services, she does not argue that she was not offered reasonable reunification services during the period prior to the 12-month review hearing.

trial court. (*Kevin R. v. Superior Court* (2010) 191 Cal.App.4th 676, 688–689; *James B. v. Superior Court* (1995) 35 Cal.App.4th 1014, 1020.) Substantial evidence is "reasonable, credible evidence of solid value such that a reasonable trier of fact could make the findings challenged . . . ." (*In re Brian M.* (2000) 82 Cal.App.4th 1398, 1401.)

Substantial evidence amply justifies the juvenile court's finding that Minors were not likely to be returned to Mother's custody within another six months. During the pendency of the proceedings, Mother did not make "significant progress in resolving problems that led to the [Minors'] removal from the home." (§ 366.21, subd. (g)(1)(B).) Mother failed to comply fully with the parenting education and mental health treatment components of her case plan. Her behavior remained volatile and irrational. She violated a court order, and incurred a criminal conviction, by picking up the boy from school; she physically assaulted Minors' Grandmother; and she was arrested and jailed for acts of vandalism she committed while visiting her own grandmother. In short, there is substantial evidence justifying the juvenile court in finding that Mother had not "demonstrated the capacity and ability both to complete the objectives of . . . her treatment plan and to provide for [Minors'] safety, protection, physical and emotional well-being, and special needs." (§ 366.21, subd. (g)(1)(C).)

Mother's writ petition does not dispute these facts, but argues that the juvenile court failed to take into account her incarceration during the proceedings, as required by section 361.5, subdivision (a)(3).[8] However, Mother's incarceration lasted only a little over a month, toward the end of the period of more than a year that elapsed between Minors' initial detention and the 12-month review hearing. Even taking into account Mother's inability to access reunification services or visit Minors during her brief

---

[8] In pertinent part, section 361.5, subdivision (a)(3), provides that at the 12-month review hearing "[i]n determining whether court-ordered services may be extended" for another six months, "the court shall consider the special circumstances of an incarcerated . . . parent . . ., including, but not limited to, barriers to the parent's . . . access to services and ability to maintain contact with his or her child."

15

incarceration, the record still contains substantial evidence to justify the juvenile court's finding that an additional six months of reunification services would not be likely to enable Mother to regain custody of Minors.

## B. Setting of Section 366.26 Hearing

At the 12-month review hearing, if the juvenile court decides not to continue the matter for an additional six months of services, the court's other options are either (1) to set a section 366.26 hearing (§ 366.21, subd. (g)(4)), or (2) to select another "planned permanent living arrangement" (a PPLA) for the child. (§ 366.21, subd. (g)(5); see also § 366, subd. (a)(2) [at review hearings, juvenile court "shall project a likely date by which the child may be returned to and safely maintained in the home or placed for adoption, legal guardianship, or in another planned permanent living arrangement"].) A PPLA is an "arrangement[], other than adoption, legal guardianship and relative placement, which also could provide a level of security and stability for [the] child." (*In re Stuart S.* (2002) 104 Cal.App.4th 203, 207.) For example, a PPLA might consist of long-term placement in a specifically identified foster home[9]; emancipation, for an older teen; or, for Indian children, a placement identified by the child's tribe. (See *id.* at p. 208; see also § 366.26, subd. (c)(1)(B)(vi)(II).) Selection of a PPLA, rather than the traditional permanent plans of adoption, guardianship, or placement with a relative, is a disfavored alternative; "the alternative of 'another planned permanent living arrangement' [is] a relatively rare choice and can be selected only on an adequate

---

[9] When a minor is placed in long-term foster care without specification of a particular foster placement, the juvenile court must review the minor's situation annually in order to provide the minor with as much permanence, or at least stability, as possible. (§§ 366.26, subd. (b)(6), 366.3, subds. (d)(3), (d)(4), (h); see *In re Stuart S.*, *supra*, 104 Cal.App.4th at pp. 207-208.) When a minor is placed in an expressly identified foster home under a PPLA, on the other hand, the minor is expected to remain in that home until the age of majority, and annual review therefore is not required in order to provide the minor with a stable placement. (See *In re Stuart S.*, *supra*, 104 Cal.App.4th at pp. 207-208.)

showing," which includes documentation by the state of "a compelling reasons for straying from the traditional permanent plans." (*In re Stuart S.*, at p. 208.)

In the present case, the juvenile court mentioned offhand the possibility of a PPLA, but when the Bureau's counsel indicated that a guardianship might be available for one of the Minors, the court decided to set a hearing under section 366.26 instead. Mother's writ petition contends that the trial court erred in so doing. The parties have not cited, and our research has not disclosed, any published authority discussing the standard of appellate review applicable to a juvenile court's order declining to order a PPLA, and instead setting the case for a section 366.26 hearing. We need not decide this issue here, however, because even if we apply the least deferential standard of review, we are not persuaded that the juvenile court erred in declining to order a PPLA at the 12-month review hearing.[10]

In order to select a PPLA for a dependent child, the court must find "*by clear and convincing evidence . . .* that there is a compelling reason for determining that a [section 366.26] hearing . . . is not in the best interests of the child because *the child is not a proper subject for adoption and has no one willing to accept legal guardianship*." (§ 366.21(g)(5), italics added.) In the present case, the only evidence before the court on these issues was the statement in the 12-month report that "[a]t this time, there are no identified relatives to care for [Minors]," because J.R. was no longer willing to care for them, and Mother had expressed a preference for foster care over placement with a relative. The 12-month report also stated that Minors' current foster home was "not a permanent placement for them," and that the Bureau intended to "seek out relatives and other possible placements for guardianship."

---

[10] For the same reason, we need not and do not address the Bureau's argument that Mother waived this issue by failing to raise it in the juvenile court.

17

Clearly, the record available to the juvenile court fell far short of establishing by "clear and convincing evidence" that Minors were not adoptable and had no prospective legal guardians. Accordingly, the court's *only* option, under the statutory scheme, was to set a section 366.26 hearing. The court did not err in so doing.

## IV.

### DISPOSITION

The petition for extraordinary writ relief is denied. (§ 366.26, subd. (*l*); rule 8.452(h).) The request for a stay of the section 366.26 hearing, which is scheduled for June 16, 2014, is denied as moot. This decision shall be final immediately in the interests of justice. (Rule 8.490(b)(2)(A).)

_____
RUVOLO, P. J.

We concur:

_____
REARDON, J.

_____
HUMES, J.

18